UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MARY CATHERINE VAN BORTEL,
also known as Kitty Van Bortel, and
HOWARD G. VAN BORTEL,

                              Plaintiffs,

                  v.

FORD MOTOR COMPANY,

                             Defendant.

_____

<u>DECISION AND ORDER</u>

21-CV-6739L

## INTRODUCTION

*"A verbal contract isn't worth the paper it's written on."*

That quote, often ascribed to movie mogul Samuel Goldwyn, is often closer to the truth than its lack of literal sense might suggest. Although oral contracts can and do exist, this case demonstrates that oral conversations containing vague promises that are never committed to writing are ill-suited means of forming enforceable contracts.

This action was filed in Monroe County Supreme Court on November 15, 2021, by Mary Catherine Van Bortel ("Van Bortel") and her brother, Howard Van Bortel, against Ford Motor Co. ("Ford"). Plaintiffs filed an amended complaint in December. Ford removed the case to this Court on December 13, 2021, based on diversity jurisdiction under 28 U.S.C. § 1332.

The amended complaint alleges that plaintiffs own a car dealership, Van Bortel Ford, in East Rochester, New York.[1]  In the fall of 2021, Van Bortel allegedly entered into an oral agreement with Ford concerning the upcoming sale of another Ford dealership, Henderson Ford, in Webster, New York.  Ford allegedly promised Van Bortel that Ford would exercise its contractual right to purchase Henderson Ford and assign the Purchase and Sale Agreement ("PSA") to plaintiffs.

In a nutshell, that never occurred.  The Henderson dealership ended up being sold to another Ford dealer, West Herr Auto Group.

Based on those events, plaintiffs assert two claims against Ford.  The first is for breach of contract, based on Ford's alleged breach of its oral contract concerning the assignment of the PSA to plaintiffs.  The second claim is brought by Van Bortel under the New York State Human Rights Law ("HRL"), N.Y. Exec. L. § 296, alleging that Ford discriminated against her on the basis of her sex by reneging on its promise and approving the sale of Henderson Ford to West Herr, which is owned by a man.[2]

Ford has moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Plaintiffs have filed a response in opposition to the motion.  The Court heard oral argument on Ford's motion on June 8, 2022.

---

[1] Since the amended complaint is the operative pleading, for the sake of convenience all references to "the complaint" will refer to the amended complaint, unless otherwise noted.

[2] A third claim, for injunctive relief, has been withdrawn by plaintiffs.

## FACTUAL BACKGROUND

The complaint alleges the following facts, which for purposes of the pending motion are accepted as true, unless otherwise noted.

Plaintiffs own several car dealerships in New York, including Van Bortel Ford.  On September 8, 2021, Ford area representative Paul Bucek contacted Van Bortel and told her that Henderson Ford was going to be sold, subject to certain contingencies.

Under the terms of Ford's Sales & Service Agreement between Ford and its dealers, in the event that a Ford dealer proposes a sale of the dealership to a buyer, Ford has the right to approve or disapprove the sale.  Ford also has a right of first refusal ("ROFR"), which gives Ford the right to purchase the dealership under the same terms offered to the prospective buyer.  Ford may also assign the ROFR to a third party.  (Dkt. #15-1.)[3]

Apparently, at the time of the conversation between Bucek and Van Bortel, there was a prospective buyer for Henderson Ford, and a PSA had either been drafted or was near completion.  Bucek said that if plaintiffs were interested in purchasing Henderson Ford, Ford would exercise its ROFR and assign the PSA to them.  Van Bortel claims that she "accepted" and agreed.  Plaintiffs refer to this as the "First Ford Agreement."  (Dkt. #1-3 ¶ 10.)

In connection with the First Ford Agreement, plaintiffs entered into a written nondisclosure agreement with Ford.  (Dkt. #1-3 ¶ 14.)  The agreement (a copy of which has been submitted by Ford), is in the form of a letter from Bucek to Van Bortel, stating that Ford is

---

[3] Although the Ford Sales & Service Agreement is not expressly referenced in the complaint, its terms are integral to the complaint, inasmuch as Ford's exercise of, or failure to exercise, its ROFR is central to plaintiffs' claims.  *See Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) ("[a] complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint").  For that reason, the Court directed the parties to submit a copy of the relevant portions of the Sales & Service Agreement, and there is no dispute as to its terms.

"prepared to consider you, as the Potential Assignee of Ford Motor Company's Right of First Refusal in regards to the proposed transaction involving ... Henderson Ford ... ." (Dkt. #8-5.)

The letter also set forth certain "requirements with regards to confidentiality and non-disclosure of information," including "all related data pertaining to Henderson Ford, which includes the terms of any existing purchase or buy/sell agreement ... ." *Id.* (emphasis in original omitted). The letter further stated that Van Bortel must "agree not to duplicate or share the information with others" and to "keep this information strictly confidential."

Significantly, the final sentence of the letter stated, "Neither this letter nor any efforts you may or may not make to pursue such a transaction shall not, [sic] in any way, obligate either party to the above-mentioned transaction." Van Bortel signed the letter, under the heading, "AGREED AND ACCEPTED." *Id.*

On September 17, 2021, Bucek and Ford representative Brennen Murray called Van Bortel and told her that Ford had decided not to approve the Henderson Ford PSA, and that Ford therefore could not assign the PSA to plaintiffs. There was thus no contract of sale to assign.

During that phone call, Van Bortel reiterated her interest in purchasing the Henderson dealership. She proposed that "if another approvable Ford dealer were to enter into a PSA with Henderson Ford, Ford would exercise its right of first refusal and assign the PSA to Plaintiffs." Am. Comp. ¶¶ 16, 17. Bucek, on behalf of Ford, allegedly agreed. Plaintiffs refer to this as the "Second Ford Agreement."[4]

---

[4] For the sake of convenience, the Court will refer to these alleged agreements as the first and second "Ford Agreements." That does not mean, however that the Court finds that plaintiffs' allegations, even if true, plausibly allege that either of the alleged agreements created a valid, enforceable contract. As explained below, I do not.

On October 25, 2021, Bucek informed Van Bortel that Henderson Ford had entered into a PSA with another dealer, West Herr. Bucek told her that Ford would not be exercising its ROFR and, therefore, would not assign the PSA to plaintiffs.

A few days later, on October 27, Van Bortel spoke with Ford's Retail Network U.S. Franchise Manager, Edie Lukas, regarding these events. In the course of their conversation, Van Bortel told Lukas how she had fought to establish herself as a successful female Ford dealer, and Lukas responded that "minority dealers are not a priority right now" for Ford. Am. Comp. ¶ 22.

Based on these factual allegations, plaintiffs allege in the first cause of action that Ford has breached both the first and second Ford Agreements by failing to exercise its ROFR and assign the PSA to plaintiffs. (Dkt. #1-3 ¶¶ 27-32.)

The second cause of action is brought only by Van Bortel, alleging that Ford violated the HRL, Exec. L. § 296(5)(b), which makes it unlawful for anyone "[t]o refuse to sell, rent, lease or otherwise deny to or withhold from any person or group of persons land or commercial space because of the ... sex ... of such person," or to "discriminate against any person because of ... sex ... in the terms, conditions or privileges of the sale, rental or lease of any such land or commercial space; or in the furnishing of facilities or services in connection therewith."

Plaintiffs allege that Ford violated this statute by refusing, on two separate occasions, to exercise its ROFR and assign the PSA to Van Bortel, and instead approving the sale of Henderson Ford to a dealership owned by a man. Plaintiffs allege that in furtherance of its efforts to discriminate against Van Bortel, Ford "rushed" the approval of the sale to West Herr. (Dkt. #1-3 ¶ 50.)

**DISCUSSION**

**I.  Motions to Dismiss:  General Principles**

In deciding a motion to dismiss a complaint for failure to state a claim upon which relief can be granted, the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff.  *GE Investors v. General Elec. Co.*, 447 F.App'x 229, 230 (2d Cir. 2011) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).  The court need not accept conclusory allegations or draw unreasonable inferences, however.  *Guilfoile v. Shields*, 913 F.3d 178, 186 (1st Cir. 2019); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018); *Schorr v. Dopico*, 205 F.Supp.3d 359, 363 (S.D.N.Y. 2016).

To survive a motion to dismiss brought pursuant to Rule 12(b)(6), the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (stating that a claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

Although the plaintiff is not required to plead "specific evidence," *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010), the pleader must present more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action' ..." *Iqbal*, 556 U.S. at 678.  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 678.  "A claim has 'facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged.'"  *Excevarria v. Dr Pepper Snapple Group, Inc.*, 764 F.App'x 108, 109 (2d Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678).

## II.  Contract Claim

The first cause of action asserts a claim for breach of contract.  Plaintiffs allege that the parties entered into two contracts, the First and Second Ford Agreements, in both of which Ford promised to exercise its ROFR and assign the PSA for Henderson Ford to plaintiffs, and that Ford breached both agreements.

To state a claim for breach of contract under New York law, a plaintiff must allege four elements:  "(I) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages" caused by the breach.  *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (internal citation and quotation marks omitted).

The first and most obvious element, then, is the existence of a contract, *i.e.*, an enforceable, mutually binding agreement.  "To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound."  *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004).  On that score, the complaint fails in several respects.

Accepting as true the allegations of the complaint, plaintiffs have pleaded an offer and acceptance.  The complaint expressly alleges that on two separate occasions Ford, through Bucek, offered to exercise its ROFR and assign the PSA to plaintiffs, and Van Bortel accepted that offer.  (Dkt. #1-3 ¶¶ 10, 16, 17.)

As stated, though, an offer and acceptance are not enough in themselves to give rise to a contract.  Concerning the other necessary elements--consideration, mutual assent and intent to be bound--the allegations fall well short of what is necessary to state a contract claim.

First, the complaint does not allege facts showing consideration, which "is a bargained-for exchange of promises or performance."  *Rojo v. Deutsche Bank*, No. 06 Civ. 13574, 2008 U.S. Dist. LEXIS 94007, at *11 (S.D.N.Y. Nov. 5, 2008), *aff'd*, 487 F.App'x 586 (2d Cir. 2012).  The New York Court of Appeals has described the presence of consideration as "a fundamental requisite" of a binding contract.  *Weiner v. McGraw-Hill, Inc.*, 57 N.Y.2d 458, 464 (1982).  *See also Greenberg v. Greenberg*, 646 F.App'x 31, 32 (2d Cir. 2016) ("The law is well settled that in order for a promise to be enforceable as a contract, the promise must be supported by valid consideration") (internal quote omitted).

"Consideration exists if 'something is promised, done, forborne or suffered by the party to whom the promise is made as consideration for the promise made to him.'"  *Alessi Equip., Inc. v. American Piledriving Equip., Inc.*, __ F.Supp.3d __, 2022 WL 63165, at *17 (S.D.N.Y. 2022) (quoting *Hamer v. Sidway*, 124 N.Y. 538, 545 (1891)) (additional internal quote omitted).  "It is hornbook law that a contract which does not require performance by each party is unenforceable for lack of consideration."  *Id.* (internal quote omitted).  Such a purported contract "constitute[s] nothing more than a gratuitous and legally unenforceable promise ... ."  *Loft Restaurant Associates, Ltd. v. McDonagh*, 209 A.D.2d 482, 483 (2d Dep't 1994).  *See also Liebowitz v. Elsevier Science Ltd.*, 927 F.Supp. 688, 703 (S.D.N.Y. 1996) (stating that "Not every promise is a contract" and that "Without consideration there is no contract").

In the case at bar, Ford allegedly twice promised Van Bortel that in the event of a prospective sale of Henderson Ford, Ford would exercise its ROFR and assign the PSA to plaintiffs. What is glaringly absent from the complaint, however, is any allegation about what plaintiffs agreed to do in return.

As to the First Ford Agreement, the complaint alleges that "Plaintiffs, in reliance on Ford's offer, promise and representations, ... entered into a nondisclosure agreement with Ford." (Dkt. #1-3 ¶ 14.) The nondisclosure agreement ("NDA") was memorialized in Bucek's September 1, 2021 letter, which was signed by Van Bortel on that date.

Under the terms of the NDA, Van Bortel agreed that "[a]ll related data pertaining to Henderson Ford ... is strictly confidential," and that '[i]n the event you [Van Bortel] decide not to pursue the opportunity, or decide you are not interested, all information will be destroyed or returned to Ford." She also "agree[d] not to duplicate or share the information with others" and to "keep this information strictly confidential." (Dkt. #8-5 at 2.)

That was the extent of Van Bortel's obligation under the NDA. Plaintiffs contend that this constituted consideration for Ford's alleged promise to assign the PSA to plaintiffs. I disagree.

The letter makes no reference to such a promise; in fact, it expressly disavows any such promise. All it states is that Ford "[is] prepared to *consider*" Van Bortel as the "*Potential Assignee*" of Ford's ROFR "in regards to the *proposed* transaction" involving Henderson Ford. (Emphases added.) The gist of the letter was simply that as a condition of Ford's consideration of whether to pursue that option, Van Bortel would have to agree that any data or information related to the prospective transaction would remain confidential. The letter also stated that the

confidential data was provided in response to Van Bortel's "interest in fulfilling the purchaser's responsibilities *in the event* Ford ... successfully completes its Right of First Refusal."  (Emphasis added.)  To reinforce the purely contingent nature of the parties' dealings, the letter concluded, "Neither this letter nor any efforts you may or not make to pursue such a transaction shall not, [sic] in any way, obligate either party to the above-mentioned transaction."

On its face, then, Van Bortel simply agreed that she would not divulge to third parties any information she became privy to in connection with Ford's consideration of whether to assign plaintiffs the PSA for Henderson Ford.  That is all.  Nothing in the letter suggests that in exchange for that agreement, Ford promised to assign the PSA to plaintiffs.  Van Bortel's agreement to keep all data and information confidential may have been a condition of Ford's willingness to consider assigning plaintiffs the PSA, but it was plainly not consideration for Ford's promise to actually do so; the NDA expressly disclaimed any such promise.

"Although it is true that 'the adequacy of consideration is not a proper subject for judicial scrutiny,' in determining the validity of contract formation, courts must nevertheless establish that 'something of real value in the eye of the law' was exchanged ... ."  *Malkin v. Sasha*, No. 20 Civ. 9874, 2021 WL 4436966, at *4 (S.D.N.Y. Sept. 27, 2021) (quoting *Apfel v. Prudential-Bache Sec.*, 81 N.Y.2d 470, 476 (1993)), *appeal filed*, 21-2675 (2d Cir. Oct. 25, 2021).  Van Bortel's acceptance of the terms of the letter can hardly be described as her giving up something of "real value."  Van Bortel did not give up *any*thing; she simply agreed that while the parties were in discussions, any data pertaining to Henderson Ford that Ford made available to Van Bortel would remain strictly confidential.

-10-

To the extent that the complaint can be read as alleging that the parties entered into an oral contract during the September 8 telephone conversation between Van Bortel and Bucek, it likewise fails to allege any consideration on Van Bortel's part. Plaintiffs allege that Bucek told Van Bortel that Ford was willing to exercise its ROFR and assign the PSA to plaintiffs, and she replied that she was agreeable to that. There is no allegation, however, that Van Bortel promised to do or refrain from doing anything whatsoever in exchange for Bucek's alleged promise.

The so-called Second Ford Agreement, arising out of the September 17 phone conversation with Van Bortel, Bucek and Murray, was entirely oral; plaintiffs do not allege that it was ever reduced to writing. Plaintiffs' reliance on that alleged agreement fares no better than their claim based on the first so-called agreement.[5]

The Second Ford Agreement comprised, at most, a promise by Ford to exercise its ROFR and assign the PSA to plaintiffs. Assuming the truth of plaintiffs' allegations that such a promise was made, it was unsupported by consideration of any kind. In addition, one element of a claim for breach of contract, performance by the plaintiff, is wholly absent. That is unsurprising, since the alleged agreement did not call for Van Bortel to do anything at all.

In analyzing this claim, it is worth paying close attention to the exact wording of the complaint. Plaintiffs allege that after reiterating her interest in purchasing Henderson Ford, Van Bortel "proposed the following offer to Ford – in the event that another approvable Ford dealer were to enter into a PSA with Henderson Ford, Ford would exercise its right of first refusal and

---

[5] Although not in itself fatal to plaintiffs' contract claim, plaintiffs' characterization of the parties' dealings as creating two separate contracts appears wholly artificial. Accepting the truth of plaintiffs' factual allegations, the facts show at most a single agreement, which was memorialized in Bucek's letter, and later orally reaffirmed in the phone conversation with plaintiff, Bucek and Murray. Since plaintiffs refer to a "first" and a "second" agreement, however, the Court will examine the two alleged agreements separately.

assign the contract to Plaintiffs."  (Complaint ¶ 16.)  "Bucek, on behalf of Ford, accepted this

offer ... ."  *Id.* ¶ 17.  Despite plaintiffs' characterization of Van Bortel's statement as an "offer,"

however, glaringly absent are any words *offering* anything to Ford.  Assuming the statements

were made as alleged, Van Bortel's statements were more in the nature of a "request" than an

offer, and Bucek's response was at most a promise, not an "acceptance."

In considering plaintiffs' allegations concerning this alleged agreement, the Court is also

mindful of the factors of particular relevance to oral contracts.  As the Second Circuit has

explained,

> To determine if parties intend to be bound by an oral contract, the court is to consider
> (1) whether there has been an express reservation of the right not to be bound in the
> absence of a writing; (2) whether there has been partial performance of the contract;
> (3) whether all of the terms of the alleged contract have been agreed upon; and
> (4) whether the agreement at issue is the type of contract that is usually committed to
> writing.  No single factor is decisive, but each provides significant guidance.

*Acun v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 852 F.App'x 552, 554 (2d Cir. 2021)

(internal quotes, alterations and cites omitted).

The alleged agreement bears none of the hallmarks of an oral contract.  There are no

allegations that the parties agreed on all of the terms of the deal or that they expressly agreed to

be bound in the absence of a writing.  Given the significance of the proposed transaction–the

assignment of a contract to purchase an entire car dealership–it hardly seems like the kind of deal

that the parties would be content to do orally over the phone.

In opposition to Ford's motion, plaintiffs state that they are prepared to amend the

complaint to add allegations that after the First Ford Agreement fell through, Van Bortel told

Bucek and Murray in their September 17 conversation that she intended to contact Randy

-12-

Henderson, the owner of Henderson Ford, directly to discuss a purchase of Henderson Ford by plaintiffs. According to the proposed second amended complaint, Bucek and Murray asked Van Bortel to "hold off" contacting Randy Henderson for the time being, and she agreed. (Dkt. #11-5 ¶¶ 18-20.)

The proposed second amended complaint further alleges that notwithstanding that request by Ford, ten days later, on September 27, 2021, Van Bortel did attempt to contact Randy Henderson. Henderson did not get back to her until October 19, when he told her–falsely as it turned out–that he no longer intended to sell the dealership. *Id.* ¶ 24. From there, the proposed second amended complaint resumes the allegations of the amended complaint, alleging that Van Bortel learned about a week later, on October 25, 2021 that Henderson Ford in fact had been sold to West Herr.

As plaintiffs would have it, Van Bortel's promise not to contact Randy Henderson directly constituted consideration for the Second Ford Agreement. That assertion is contradicted by plaintiffs' own allegations, since Van Bortel did contact Henderson, albeit ten days later. Her brief delay in reaching out to Henderson (with a proposal that he rebuffed) cannot reasonably be considered "something of real value" that she gave to Ford. *Grimaldi v. Sangi*, 177 A.D.3d 1208, 1210 (3d Dep't 2019) (citation omitted). *See also Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 374 (2d Cir. 2000) (contract will not be deemed void for lack of consideration so long as each party received "something of value") (quoting *Apfel*, 81 N.Y.2d at 476).

The problems with this claim do not end there, however. "It is a basic tenet of contract law that, in order to be binding, a contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'" *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288-89 (2d Cir. 2019) (quoting

-13-

*Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999)).  "The manifestation of mutual assent must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms."  *Id.* at 289.  "As a general matter, courts look to the basic elements of the offer and acceptance to determine if there was an objective meeting of the minds sufficient to create a binding and enforceable contract."  *Fisher v. Aetna Life Ins. Co.*, 32 F.4th 124, 136 (2d Cir. 2022) (citing *Express Indus.*, 93 N.Y.2d at 589).

From the allegations of the complaint, it is evident that no such meeting of the minds took place.  The informal understanding described by plaintiff said virtually nothing about any of the essential terms of the "agreement," but allegedly consisted of a bare promise by Ford to assign some unidentified, hypothetical PSA to plaintiffs.  Nothing was said about what Van Bortel was obligated to do in return; no terms were set and no sums of money referenced.

"If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract."  *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 482 (1989); *see also Express Indus.*, 93 N.Y.2d at 589 ("To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms"); *Grasso v. Donnelly-Schoffstall*, No. 21-1021, 2022 WL 728839, at *1 (2d Cir. Mar. 11, 2022) ("As to the first element, '[i]t is well settled that a contract must be definite in its material terms in order to be enforceable'") (quoting *Clifford R. Gray, Inc. v. LeChase Constr. Servs., LLC*, 31 A.D.3d 983, 985 (3d Dep't 2006)); *Pan-American Life Ins. Co. v. Antarctica Cap. Mgmt., LLC*, No. 20-CV-9236 , 2022 WL 992840, at *4 (S.D.N.Y. Mar. 31, 2022) ("Th[e] meeting of the minds must include agreement on all essential terms") (quoting N.Y. Jur. 2d § 31).

Ford argues that plaintiffs' allegations concerning the Second Ford Agreement fail to state a claim for breach of contract, in part because there are no allegations about the essential terms of the underlying PSA, such as the purchase price, the assignment of assets and liabilities, etc. Plaintiffs respond that such details would properly have been set forth in the PSA itself, but that they did not need to spelled out in the oral agreement to assign the PSA to plaintiffs.

The facts alleged by plaintiffs concerning the Second Ford Agreement are unclear as to precisely what the terms of the agreement were, but what is clear is that there was no contract. One scenario presented by plaintiffs' allegations is that Ford agreed that if and when there were another PSA for Henderson Ford, Ford would exercise its ROFR and assign it to plaintiffs, and Van Bortel agreed that plaintiffs would accept the assignment of the PSA to them, and thereby step into the shoes of the previous prospective purchaser. In other words, plaintiffs would have committed themselves to accepting assignment of the PSA, with no contingencies.

If that is what plaintiffs allege, then Ford is correct that the Second Ford Agreement did not amount to a valid contract, because as alleged in the complaint, the terms of the underlying PSA were never set forth. They could not have been, of course, because there was no specific PSA under discussion, but Van Bortel would have been promising unconditionally to enter into a future contract with no knowledge of its essential terms. That would amount to little more than an "agreement to agree," which is unenforceable. *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 95 (2d Cir. 2007) (citing *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109 (1981)).

A second possibility is that Ford promised to offer to assign the PSA to plaintiffs, but that plaintiffs would be free at that point to accept or reject the assignment. That is suggested by the

September 1 letter from Bucek to Van Bortel, in which he states, in the context of the nondisclosure agreement, "In the event you decide not to pursue the opportunity, or decide you are not interested, all information will be destroyed or returned to Ford."  Although plaintiffs assert that the NDA only applied to the First Ford Agreement and that it terminated upon Ford's decision not to approve the PSA in existence at that time, plaintiffs' allegations about the Second Ford Agreement would be consistent with a similar understanding.[6]

The problem that poses with respect to plaintiffs' contract claim is that the agreement would not have obligated plaintiffs to do anything in return for Ford's promise.  Ford would have been obligated to offer plaintiffs the opportunity to accept the assignment of a PSA, but plaintiffs, after reviewing the PSA, could have decided not to.  The only burden to do anything would have been on Ford, which would receive nothing in return for its promise.

Under either scenario, then, plaintiffs have not stated a viable contract claim.  The fact that the allegations in the complaint leave it unclear which scenario is presented only further demonstrates that there was no meeting of the minds here.  According to the complaint, it was never spelled out what, if anything, plaintiffs would be obligated to do upon Ford's assignment of a PSA to them.  For the same reason, it is impossible to discern what would have constituted a breach by plaintiffs.  The parties' agreement, if there was one, was therefore not an enforceable contract.  *See Roelcke v. Zip Aviation, LLC*, __ F.Supp.3d __, 2021 WL 5491395, at *8 (S.D.N.Y. 2021) ("where a contract does not have such essential terms as the time or *manner of*

---

[6] That is also consistent with the Ford Sales & Service Agreement, which states, "The Company's Right of First Refusal ... may be assigned to any third party," and that "[t]he Company shall have the opportunity to discuss the terms of the buy/sell agreement with any potential Assignee, as long as such information is treated confidentially." (Dkt. #15-1 at 3.)

-16-

*performance* or price to be paid, the contract is unenforceable") (internal quote and citation omitted; emphasis added).  *See also 166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*, 78 N.Y.2d 88, 91 (1991) ("a court cannot enforce a contract unless it is able to determine what in fact the parties have agreed to"); *Schlamowitz v. Tirado*, No. 12 CV 504, 2014 WL 4199711, at *5 (E.D.N.Y. Aug. 22, 2014) ("Even where the parties believe they are bound, if the terms of the agreement are so vague and indefinite that there is no means by which such terms may be made certain, then there is no enforceable contract") (internal quote and alteration omitted).

Since the alleged agreement did not impose any obligations on plaintiffs, it is not surprising that the complaint also fails to allege another element of a contract claim, performance by plaintiffs.  *See Moreno-Godoy v. Kartagener*, 7 F.4th 78, 85 (2d Cir. 2021) ("performance by the party seeking recovery" is an essential element of a breach of contract claim under New York law); *Comfort Inn Oceanside v. Hertz Corp.*, 2011 WL 5238658, at *3 (E.D.N.Y. Nov. 1, 2011) ("A claimant's failure to plead the performance of its own contractual obligations is fatal to a breach of contract claim even if the other requisite elements are properly pleaded").

The proposed second amended complaint alleges that Van Bortel's end of the bargain was that she would hold off on contacting Randy Henderson directly.  Although Van Bortel waited ten days to try to contact Randy Henderson, nothing in the complaint suggests that this brief delay could reasonably be considered "performance" by plaintiff.  At any rate, as noted above, Bucek allegedly asked Van Bortel not to contact Henderson directly at all, or at least until further notice, so whether she waited ten days or ten minutes to do so, the fact remains that she *did* attempt to reach Henderson, contrary to her promise not to.  Plaintiffs' own allegations, therefore, do not show performance by plaintiffs.

-17-

Ford next argues that the alleged oral contract is void under New York's statute of frauds, which provides in pertinent part that "[a]n estate or interest in real property ... cannot be created, granted, assigned, surrendered or declared, unless ... by a deed or conveyance in writing ... ." Gen. Oblig. L. § 5-703.  Noting that the amended complaint in this case expressly alleges that "the PSA ... concerned not only the sale of the Henderson Ford Dealership, but also the right to purchase, rent or lease, land or commercial space," (Dkt. #1-3 ¶ 47), the alleged agreements between Ford and plaintiffs would have had to be in writing to be effective under New York law.

In light of the Court's conclusion that there is no basis for a breach of contract claim, I find it unnecessary to reach this issue.  In general, noncompliance with the statute of frauds is an affirmative defense to an action for breach of contract.  A breach of contract claim, by its nature, presumes the existence of a contract.  Since, as explained above, there never was any contract between the parties, matters concerning the statute of frauds are immaterial to this claim.  The problem with the claim is not that the parties did not commit their contract to writing, but that they never entered into a contract at all.  *See Vendome v. Oldenburg*, 198 A.D.3d 450, 450 (1st Dep't 2021) ("The statue of frauds requires that contracts for the sale of real property be accompanied by a signed writing").

In sum, even construing the complaint's allegations in the light most favorable to plaintiffs, and drawing all reasonable inferences in plaintiffs' favor, the Court concludes that the contract claim is facially meritless and must be dismissed.  I also deny plaintiffs' request for leave to file a second amended complaint to include additional allegations relating to this claim, since the proposed second amended complaint would still be subject to dismissal for failure to state a claim upon which relief can be granted, as explained above.  *See AEP Energy Servs. Gas*

*Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 726 (2d Cir. 2010) ("Leave to amend may be denied on grounds of futility if the proposed amendment fails to state a legally cognizable claim or fails to raise triable issues of fact").

### III.  New York Human Rights Law Claim

In the second cause of action, Van Bortel alleges that Ford discriminated against her on account of her sex, in violation of the HRL, which makes it unlawful for any person or entity to, *inter alia*, refuse to sell, rent or lease land or commercial space to any person on account of her sex, or to discriminate against any person because of her sex, in the terms, conditions or privileges of the sale, rental or lease of any land or commercial space.  N.Y. Exec. L. § 296(5)(b). Van Bortel alleges that Ford did so by refusing to exercise its ROFR and assign the PSA to Van Bortel, and instead approving the sale of Henderson Ford to a dealership, West Herr. Plaintiffs allege on information and belief that West Herr is owned by a man.  (Dkt. #1-3 at 5, ¶ 21.)

Discrimination claims under the HRL are generally subject to the same analysis applied to claims brought under federal discrimination statutes.  *See Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (comparing HRL employment discrimination claims to Title VII claims); *Williams v. N.Y.C. Housing Auth.*, 879 F.Supp.2d 328, 336 (E.D.N.Y. 2012) (HRL provisions concerning housing discrimination under HRL are substantially similar to analogous provisions of federal Fair Housing Act).  Under that analysis, to state a claim, the plaintiff must allege facts showing that she belonged to a protected class, and that the defendant took some action against her under circumstances giving rise to an inference of discrimination.  *See Belton v. Borg & Ide Imaging, P.C.*, 512 F.Supp.3d 433, 441 (W.D.N.Y. 2021).

To survive a motion to dismiss, then, a plaintiff must plausibly allege that her protected characteristic (in this case, her sex) was a motivating factor in the defendant's decision to take the action that it did.  *Id.* (citing *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015)).  Although she need not plead detailed facts, the complaint must still set forth allegations that would support an inference of discriminatory animus, such as statements by the defendant or the defendant's more favorable treatment of someone outside the protected class who was similarly situated to the plaintiff in all material respects.  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000); *Belton*, 512 F.Supp.3d at 443.

I conclude that plaintiff's allegations fail to state a claim under the HRL, because she has not alleged facts indicative of discriminatory animus on Ford's part.  Although plaintiff was not assigned the PSA as she had hoped, there are no allegations indicating that her sex had anything to do with that.

In support of her claim, Van Bortel relies almost entirely on two things:  (1) she is a woman, and West Herr Ford–the eventual assignee of the PSA for Henderson Ford–is allegedly owned by a man; and (2) the alleged statement by Edie Lukas that "minority dealers are not a priority right now" for Ford.

Even at the pleading stage, that is insufficient.  Although the respective genders of plaintiff and the owner of West Herr may be *relevant* to plaintiff's HRL claim, the mere fact that West Herr is owned by a man is not enough to make out a claim of sex discrimination.  If it were, then the owner of West Herr could presumably state a facially valid HRL claim, if Ford had assigned the PSA to plaintiffs instead.  In other words, faced with two competing dealerships,

-20-

one male-owned the other female-owned, Ford would find itself subject to potential liability under the HRL, no matter what choice it made, according to plaintiff's reasoning.

In a similar vein, the Second Circuit has stated that although in a Title VII case, an inference of discrimination *may* arise when an employer replaces a terminated employee with an individual outside the employee's protected class, "for the purposes of 12(b)(6) analysis, we may not consider a particular allegation in isolation; instead, we must consider whether the 'factual content' in a complaint 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Franchino v. Terence Cardinal Cook Health Care Ctr., Inc.*, 692 F.App'x 39, 43 (2d Cir. 2017) (affirming dismissal of a male plaintiff's sex discrimination claim, and stating that the mere fact that plaintiff was replaced by a female did not plausibly suggest discrimination when the rest of the complaint undercut any such suggestion) (quoting *Iqbal*, 556 U.S. at 678).

Here, the complaint's "factual content" undercuts plaintiffs' assertion that Van Bortel's sex was a motivating factor in Ford's decision not to assign the PSA to plaintiffs.  For one thing, it was Ford who (through its agent, Bucek) initially reached out to Van Bortel, not the other way around.  If Ford had not wanted Henderson Ford to be sold to a woman, it would have made little sense for Ford to raise this matter with Van Bortel in the first place.

In addition, the complaint sets forth a series of allegations intended to show that Van Bortel was eminently qualified to own and operate the Henderson Ford dealership.  Much of that, however, consists of recognition given to Van Bortel by Ford itself.  Plaintiffs allege that Van Bortel's relationship with Ford began when a Ford representative approached her, and solicited her to purchase a Ford dealership.  She became hugely successful, going on to establish a "mega

-21-

location in East Rochester," which "has consistently had the highest sales performance and customer service scores in the market," and "has been the #1 selling Ford dealer in the market area every year for the last twenty (20) years." Amended Complaint ¶¶ 36-40. Because of that stellar record of success, Van Bortel has received numerous awards, including the Ford President's Award for each of the past ten years, the Ford Salute to Dealers Award, and the ONE Ford Elite Award. *Id.* ¶ 41.

Yet plaintiffs allege that the same company that has consistently honored Van Bortel for her achievements, and which reached out to her to see if she would be interested in buying Henderson Ford, suddenly and inexplicably denied her a franchise opportunity on account of her sex. It makes no sense. Absent some evidence to support such a claim, such an inference is simply unreasonable. *See Villetti v. Guidepoint Global, LLC*, No. 21-2059-cv, 2022 WL 2525662, at *4 (2d Cir. July 7, 2022) (stating in the employment context that "we have repeatedly emphasized that when the firing decisionmaker is also the hiring decisionmaker, 'it is difficult to impute to [him] an invidious motivation that would be inconsistent with the decision to hire'") (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)); *Paul v. Lenox Hill Hosp.*, No. )), 2016 WL 4775532, at *13 (E.D.N.Y. Jan. 15, 2016) ("It would be unreasonable to infer that, less than seven months after hiring Plaintiff to a permanent position, [her supervisor] developed racial animus against her").

Beyond the mere fact of her gender, Van Bortel relies on the alleged statement by Ford representative Edie Lukas that "minority dealers are not a priority right now" for Ford. According to the complaint, Lukas (a woman) made that statement after Van Bortel, during their

conversation concerning the sale of Henderson Ford to West Herr, "explained how she [Van Bortel] had fought to establish herself as a successful female Ford dealer." *Id.* ¶ 22.

Assuming Lukas made that statement as alleged, it does not support plaintiff's HRL claim. First, it does not suggest in any way animus against women. At most, it indicates that Van Bortel should not expect Ford to accord her any *preferential* treatment simply because she is a woman. *Cf. DiPilato v. 7-Eleven, Inc.*, 662 F.Supp.2d 333, 352 (S.D.N.Y. 2009) (allegation that defendant's national franchise sales coordinator told plaintiff that her franchise application should be denied because she was a single female over the age of forty sufficiently stated an actionable claim under the HRL).

Second, there are no allegations indicating that Lukas was in any way involved in the alleged agreements between Ford and plaintiffs, or in the sale of Henderson Ford to West Herr. The conversation took place *after* Van Bortel learned of the sale of Henderson Ford to West Herr, and Lukas's alleged statement was apparently made not to justify Ford's decision so much as to respond to Van Bortel's emphasis on her status as a successful female Ford dealer.

It bears repeating that the standard to be applied by the Court on a motion to dismiss is not, as it once was, to determine if there is *any* set of facts consistent with the allegations of the complaint that might entitle plaintiff to relief.. That standard was rejected by the Supreme Court long ago in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Under the *Twombly/Iqbal* standard, "the court's task is not to decide whether there might be some conceivable set of facts, consistent with the plaintiff's allegations, that would support a claim. The question for the court is whether the complaint contains sufficient factual matter to 'state a claim to relief that is plausible on its face.' 'A claim has facial plausibility when the

-23-

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Hunley v. DTLR Villa, Inc.*, __ F.Supp.3d __, 2022 WL 1447737, at *2 (W.D.N.Y. 2022) (quoting *Twombly*, 550 US. at 570, and *Iqbal*, 556 U.S. at 678).  This "plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quotations omitted).

The facts alleged here show no more than such a "sheer possibility."  Essentially, Van Bortel relies on the fact that she is a woman, and West Herr is owned by a man, and on a single statement by Lukas that is not in itself suggestive of discriminatory animus.  That is insufficient to make out a plausible claim of discrimination, even at the pleading stage.  Ford's decision to approve the sale of Henderson Ford to West Herr rather than to plaintiffs could have been based on any number of factors and considerations, and plaintiffs cannot make out a claim under the HRL based on a purely speculative, unsupported assertion that because Van Bortel is female, discrimination must have been involved.[7]

---

[7] My decision in this regard renders it unnecessary for the Court to address Ford's other arguments concerning the HRL claim.

**CONCLUSION**

Defendant's motion to dismiss the complaint (Dkt. #8) is granted, and the complaint is

dismissed.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
August 10, 2022.